# EXHIBIT "C"

NICHOLAS A. TRUTANICH
United States Attorney
District of Nevada
Nevada Bar Number 13644
SIMON F. KUNG
Assistant United States Attorney
501 Las Vegas Blvd. South, Suite 1100
Las Vegas, Nevada 89101
(702) 388-6336
simon.kung@usdoj.gov

*Attorneys for Plaintiff*
*The United States of America*

FILED / ENTERED / RECEIVED / SERVED ON
COUNSEL/PARTIES OF RECORD
OCT 27 2020
CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY: DEPUTY

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEVADA**

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>JOHN FRANK THOMAS III,<br>aka "John Frank,"<br>aka "Johnathan West,"<br>aka "John Frank Rodgers,"<br>aka "John Marshall,"<br>aka "John Edwards," and<br>THOMAS JOSEPH BECKER,<br><br>Defendants. | **CRIMINAL INDICTMENT**<br><br>Case No.: 2:20-cr- 296<br><br>**<u>VIOLATIONS:</u>**<br><br>18 U.S.C. § 1349 – Conspiracy to Commit Wire Fraud; and<br><br>18 U.S.C. § 1341 – Wire Fraud<br><br>FORFEITURE ALLEGATION |

THE GRAND JURY CHARGES THAT:

**COUNT ONE**
*Conspiracy to Commit Wire Fraud*
(18 U.S.C. § 1349)

The Object of the Conspiracy

1. From on or about September 2010, and continuing up to and including August 2019, in the State and Federal District of Nevada and elsewhere,

EXHIBIT "C"

JOHN FRANK THOMAS III,
aka "John Frank,"
aka "Johnathan West,"
aka "John Frank Rodgers,"
aka "John Marshall,"
aka "John Edwards" ("THOMAS"), and
THOMAS JOSEPH BECKER ("BECKER"),

defendants herein, and others known and unknown, knowingly and intentionally combined, conspired, confederated, and agreed, to commit an offense against the United States in violation of Title 18, United States Code, Section 1349, that is to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

<u>Manner and Means of the Conspiracy</u>

2. The objects of the conspiracy were carried out, and to be carried out, in substance, as follows:

a. During the course of the conspiracy THOMAS and BECKER maintained and advertised the following entities, which they marketed to investors as investment funds: Sports Psychometrics; Vegas Basketball Club; Vegas Football Club; Einstein Sports Advisory; Quantum Sports Advisory; Wellington Sports Club; and Welscorp, Inc. THOMAS and BECKER began recruiting clients for at least one of the aforementioned entities no later than September 2010.

b. As part of their marketing to investors, THOMAS and BECKER represented that they would use the invested money to make bets at sports books in Las Vegas, Nevada. THOMAS and BECKER made misrepresentations to investors that they would use their specialized sports betting skills and unique betting strategy to make sports bets with the invested money. For example, in 2014 THOMAS and BECKER falsely told potential investors, with regard to Vegas Football Club, that "[i]ts sole purpose is to grow its Member's bankrolls by making strategic bets on sporting events." Each investor entered

EXHIBIT "C"

into a "Sports Advisory Agreement" with THOMAS and BECKER. In a typical agreement, THOMAS and BECKER represented to and sought to induce investors to agree that, "In consideration of SPORTSADVISOR's development of a proprietary handicapping system that is highly accurate in predicting the outcome of NFL, NCAA Football, MLB, NBA, and NCAA Basketball games, INVESTOR has contracted SPORTSADVISOR to manage INVESTOR's funds by making picks and placing bets at legal domestic sportsbooks. . . until the INVESTOR's funds grow [X]-fold." Rather than using the investor funds to bet on sports as promised, THOMAS and BECKER spent the overwhelming majority of incoming money on themselves or to pay out other investors, *i.e.* they ran a Ponzi scheme.

c. Throughout the course of the scheme, THOMAS and BECKER posted advertisements online, including on Craigslist. For example, in or around July 2014, THOMAS and BECKER posted an advertisement on Craigslist for Vegas Football Club titled "— SPORTS BETTORS — Tired of Losing? (Want to make a Fortune?)." The advertisement falsely claimed "[w]e have an interesting new twist on the sports betting world that will make you $6,000 to $24,000 or more per week."

d. THOMAS and BECKER also made fraudulent representations to investors regarding their success rate at sports betting. For example, in 2014 they told investors that their "'special insights' and ahead-of-the-curve strategies . . . can generate an Average-Profit-Per-Bet of +140% or plus $140 per $100 bet ... and possibly as high as +180% or plus $180 per $100 bet. In essence, unlimited riches." Also, in August 2015, THOMAS and BECKER advertised a purported "perfect investment opportunity," offering "quick access to funds -- funds can be withdrawn by wire or transfer in only one day" and "exceptionally high yield -- we achieved a +10.75% ROI per betting day during 2014

EXHIBIT "C"

Football Season." In August 2016, THOMAS and BECKER told investors that they had "an extraordinary investment opportunity" and a "low-risk way to TRIPLE your funds in less than 4 months." In June 2017, THOMAS and BECKER promised to investors a "low-risk way to TRIPLE your funds in less than 6 months." The August 2016 and June 2017 communications to investors included falsified returns on investment from their alleged sports betting. In reality, THOMAS and BECKER had never achieved the winning rates represented to investors.

e. Throughout the course of the scheme, THOMAS and BECKER induced at least six hundred individuals to deposit money in one of their purported investment funds. These individuals deposited amounts ranging from less than $10,000 to over $500,000. The deposited money from investors went into bank accounts opened and controlled by THOMAS and BECKER.

f. Individuals who deposited money with THOMAS and BECKER were given login credentials to access their accounts by logging in through an online account on websites controlled by THOMAS and BECKER. Through these websites, investors could then access a spreadsheet showing their purported account activity, including percentage gain or loss of their total account balance based on the alleged sports betting activities. THOMAS and BECKER manipulated the websites so that investors would see their account values increasing multiple-fold in value based on winning bets when in fact no such bets (or gains) were occurring. For example, THOMAS and BECKER falsely represented to J.S. that his account starting at $15,005.65 with Vegas Basketball Club, grew to approximately $333,000, from February 2015 to March 2016. THOMAS and BECKER falsely represented to F.G. that his account starting at $535,738 grew to approximately $13,500,000 from October 2014 to April 2015. And THOMAS and BECKER falsely

EXHIBIT "C"

represented to W.K. that his account starting at $25,000 with Wellington Sports Club grew to over $9,000,000 from July 2016 to July 2018.

g. Based on written agreements, investors with THOMAS and BECKER had the option of cashing out their accounts after reaching a pre-determined target amount (*e.g.* three or five times the initial investment). Some investors also had the option of rolling over their account balance into a new investment agreement after reaching the target amount. Many investors opted to roll over their accounts into a new investment contract after hitting the target amounts, based on fraudulent representations by THOMAS and BECKER that their accounts had grown multiple-fold in value.

h. Most if not all investors were not paid out the full balance shown in their online accounts even though these individuals were entitled to payment under their agreements and had made repeated attempts to receive payment. For many investors, THOMAS and BECKER did not pay back anything at all, not even their initial deposits, despite their account values reflecting much higher amounts. The investors who were paid by THOMAS and BECKER were paid with money from other investors, not winnings from sports betting.

i. THOMAS and BECKER repeatedly made excuses for why they could not pay investors the amount reported in their accounts and ignored their calls and emails. For instance, some of THOMAS's excuses include that he had an abscess tooth for which he had been hospitalized, that his assistant died in a car accident, that he was having issues with withdrawing money from banks and sportsbooks, and that he was having issues with the IRS. THOMAS and BECKER also told some investors that they would be paid out once a large deposit from a hedge fund came in.

EXHIBIT "C"

j. Despite THOMAS and BECKER receiving more than $29 million from investors and claiming to have multiplied investors' funds, THOMAS and BECKER paid out to investors approximately $20 million from those bank accounts, resulting in a loss to investors of at least $9 million, not including the fictitious gains the investors purportedly had earned. THOMAS and BECKER used money from bank accounts associated with the investment entities to pay personal expenses, including dining, housing, home improvement, and transportation costs.

All in violation of 18 U.S.C. § 1349.

**COUNTS TWO TO FOURTEEN**
Wire Fraud
(18 U.S.C. §§ 1343, 2)

3. The allegations contained in Paragraphs One and Two of this Criminal Indictment are hereby realleged and incorporated herein by reference.

4. On or about the dates listed below, in the State and Federal District of Nevada,

JOHN FRANK THOMAS III,
aka "John Frank,"
aka "Johnathan West,"
aka "John Frank Rodgers,"
aka "John Marshall,"
aka "John Edwards," and
THOMAS JOSEPH BECKER,

defendants herein, aiding and abetting each other, participated in and devised and intended to devise a scheme and artifice to defraud and for obtaining money and property by means of materially false and fraudulent pretenses, representations and promises, as described in Paragraphs One and Two above.

5. On or about the dates below, in the State and District of Nevada and elsewhere, defendants, for the purpose of executing the scheme and artifice to defraud

EXHIBIT "C"

described in Paragraphs One and Two above, transmitted and caused to be transmitted by means of wire communication in interstate commerce, the writings, signs, signals, pictures, and sounds described below, with each wire communication constituting a separate violation of Title 18, United States Code, Sections 1343 and 2.

| COUNT | DATE | DESCRIPTION OF TRANSMISSION |
|---|---|---|
| TWO | 3/10/2017 | A wire transfer of $237,520.07 from a Citibank account in California to a US Bank account ending in 8128 in Nevada. |
| THREE | 3/16/2017 | A wire transfer of $237,520.07 from a Citibank account in California to a US Bank account ending in 8128 in Nevada. |
| FOUR | 5/5/2017 | A wire transfer of $100,000 from a Citizens Business Bank account in California to a Wells Fargo account ending in 6502 in Nevada. |
| FIVE | 7/19/2017 | A wire transfer of $50,023.08 from a Wells Fargo Bank account in California to a US Bank account ending in 8128 in Nevada. |
| SIX | 9/8/2017 | A wire transfer of $100,023.40 from a Citizens Business Bank account in Wyoming to a US Bank account ending in 8128 in Nevada. |
| SEVEN | 9/19/2017 | A wire transfer of $100,025.27 from a Wells Fargo Bank account in California to a US Bank account ending in 8128 in Nevada. |
| EIGHT | 10/04/2017 | A wire transfer of $100,023.08 from a Wells Fargo Bank account in California to a US Bank account ending in 8128 in Nevada. |
| NINE | 10/20/2017 | A wire transfer of $100,023.40 from a Citizens Business Bank account in Wyoming to a US Bank account ending in 8128 in Nevada. |

EXHIBIT "C"

| COUNT | DATE | DESCRIPTION OF TRANSMISSION |
|---|---|---|
| TEN | 12/27/2017 | A wire transfer of $500,027.00 from a BOKF NA Bank account in Oklahoma to a Citibank account ending in 3671 in Nevada. |
| ELEVEN | 1/31/2018 | A wire transfer of $100,000 from a Citizens Business Bank account in California to a Wells Fargo account ending in 6502 in Nevada. |
| TWELVE | 2/16/2018 | A wire transfer of $100,026.07 from a First National Bankers Bank account in Georgia to a Wells Fargo account ending in 6502 in Nevada |
| THIRTEEN | 7/28/2018 | A wire transfer of $25,023.58 from a JPMorgan Chase Bank account in California to a Bank of Nevada account ending in 3753 in Nevada. |
| FOURTEEN | 2/8/2019 | A wire transfer of $25,030.57 from a Bank of America account in Texas to a JPMorgan Chase Bank account ending in 9386. |

**FORFEITURE ALLEGATION**

***Conspiracy to Commit Wire Fraud and Wire Fraud***

6. The allegations contained in Counts One to Fourteen of this Criminal Indictment are hereby realleged and incorporated herein by reference for the purpose of alleging forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) with 28 U.S.C. § 2461(c).

7. Upon conviction of any of the felony offenses charged in Counts One to Fourteen of this Criminal Indictment,

**JOHN FRANK THOMAS III,**
**aka "John Frank,"**
**aka "Johnathan West,"**
**aka "John Frank Rodgers,"**
**aka "John Marshall,"**
**aka "John Edwards", and**
**THOMAS JOSEPH BECKER,**

EXHIBIT "C"

defendants herein, shall forfeit to the United States of America, any property, real or personal, which constitutes or is derived from proceeds traceable to a violation of 18 U.S.C. § 1343, a specified unlawful activity as defined in 18 U.S.C. §§ 1956(c)(7)(A) and 1961(1)(B), or 18 U.S.C. § 1349, conspiracy to commit such offense, an in personam criminal forfeiture money judgment including, but not limited to, at least $9,809,575.84 (property).

8. If any property being subject to forfeiture pursuant to 18 U.S.C. § 981(a)(1)(C) with 28 U.S.C. § 2461(c), as a result of any act or omission of the defendant –

a. cannot be located upon the exercise of due diligence;

b. has been transferred or sold to, or deposited with, a third party;

c. has been placed beyond the jurisdiction of the court;

d. has been substantially diminished in value; or

e. has been commingled with other property which cannot be divided without difficulty;

it is the intent of the United States of America, pursuant to 21 U.S.C. § 853(p), to seek forfeiture of any other property of the defendant for the property listed above.

All pursuant to 18 U.S.C. § 981(a)(1)(C) with 28 U.S.C. § 2461(c); 18 U.S.C. § 1343; 18 U.S.C. § 1349; and 21 U.S.C. § 853(p).

**DATED** this 27th day of October, 2020.

**A TRUE BILL:**

/S/
FOREPERSON OF THE GRAND JURY

NICHOLAS A. TRUTANICH
United States Attorney

SIMON F. KUNG
Assistant United States Attorney

EXHIBIT "C"